**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| | : | **NO. 19-373** |
| **v.** | : | |
| | : | |
| **MYLES HANNIGAN** | : | |
| | : | |

<u>**MEMORANDUM**</u>

**KENNEY, J.**                                           **March 17, 2022**

Before the Court is Defendant Myles Hannigan's second *pro se* Motion for Reconsideration in less than nine months, alleging that he again presents an "extraordinary and compelling reason" for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and satisfies the separate analysis of sentencing factors under 18 U.S.C. § 3553(a). ECF No. 59.

Following Defendant's initial May 13, 2020 Motion for Compassionate Release (ECF No. 29), the Government agreed that the Defendant met the threshold test of a medical condition under the Sentencing Commission's policy statement of the Sentencing Guidelines under 18 U.S.C. § 3582(c) (ECF No. 30 at 17 n.7). Therefore, this Court's July 2020 Memorandum focused on the dispositive factors in § 3553(a), which did not support a reduction in sentence, and denied Defendant's Motion for Compassionate Release. ECF No. 33.

Defendant subsequently filed his first Motion for Reconsideration alleging that due to the ongoing COVID-19 pandemic and his medical conditions, he presented an "extraordinary and compelling reason" for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and that new case law regarding ineffective medical care had emerged that satisfied the sentencing factors under 18 U.S.C. § 3553(a)(2)(D). The Government opposed both assertions, namely due to Mr. Hannigan's vaccination against COVID-19 and the severity of his crimes. ECF No. 42. In April

1

2021, this Court found that the vaccination mitigated any "extraordinary and compelling reason" for reduction in sentence and the § 3553(a) sentencing factors continued to support Mr. Hannigan's sentence and denied his motion. ECF No. 56 at 2.

On November 3, 2021, Mr. Hannigan filed this second Motion for Reconsideration alleging that his medical conditions changed in that they deteriorated and the immunity from his vaccination against COVID-19 is waning. ECF No. 59.

The Government opposes Defendant's current Motion for Reconsideration alleging that Mr. Hannigan's vaccination and booster shot, and adequate medical care, as well as the prison's effective mitigation of the spread and effects of the virus, eliminate his purported "extraordinary and compelling reason" for compassionate release. ECF No. 66, 73. The Government also alleges that the § 3553(a) sentencing factors continue to support Mr. Hannigan's imprisonment. ECF No. 66.

The Court will evaluate Mr. Hannigan's current circumstances in regard to both the conditions warranting compassionate release pursuant to 18 U.S.C. § 3582(c) and the sentencing factors outlined in § 3553(a).

## I.   BACKGROUND

### A.  Mr. Hannigan's Criminal History

On July 26, 2019, Mr. Hannigan pled guilty to Count 1: Obstructing the Due Administration of the Internal Revenue Service (IRS), in violation of 26 U.S.C. § 7212(a), and to Counts 2 through 18: Aiding and Assisting the Filing of False Federal Tax Returns, in violation of 26 C.S.C. § 7206(2). ECF No. 10 at 1. Mr. Hannigan was sentenced to 52 months in prison with one year of supervised release and recommended to be placed in the Residential Drug Abuse Program ("RDAP") while in custody of the BOP. ECF No. 27 at 2. Mr. Hannigan's

guideline imprisonment range was 46 months to 57 months. See PSR ¶ 92. Mr. Hannigan was also required to pay $3,270,566.89 in restitution to victims with special assessment of $1,800. ECF. No. 10 at 6.

Mr. Hannigan was the owner and operator of Payroll Professionals, Incorporated ("PPI") which he owned and operated for approximately two decades, working out of 104 West Front Street, Suite 201, in Media, Pennsylvania. ECF No. 1 ¶ 3. Mr. Hannigan advertised PPI as a third-party payroll service, meaning that PPI would assist clients by managing certain payroll services such as issuing payroll checks for its clients and forwarding payments to the federal, state, and local taxing authorities. *Id.* PPI would perform these actions by making authorized withdrawals of funds from a client's business bank account, depositing those funds into a PPI bank account, and then issuing paychecks, paying taxes, and filing tax documents reflecting monies owed and monies paid to the IRS and other state and local taxing authorities. *Id*. at ¶ 4. As part of their services, PPI would also prepare and submit Form 941s to the IRS on behalf of their clients. *Id.* PPI generated revenue by charging their clients a fee for these services. *Id*. at ¶ 6. The Company's website explained that PPI was an "administrative services organization offering comprehensive payroll management, HR solutions and benefits administration for your business," and claimed that for over 20 years, payroll administration was the "premier service" offered by PPI. ECF No. 9.

However, Mr. Hannigan did not follow through on PPI's purported "premiere service" to their clients, instead Mr. Hannigan stole client funds meant for tax payments and misled his clients into believing their tax payments were current. ECF No. 9. During the years 2013-2015, PPI had approximately seventy-five clients—nearly 50% of these clients became victims of Mr. Hannigan's fraudulent scheme. ECF No. 9. Many of Mr. Hannigan's clients who became victims

of his scheme were small to medium sized businesses. ECF. No 1 at ¶ 7. This included thirty-five companies (hereinafter referred to as Victim 1 through Victim 35) with employees who worked in their local communities. *Id.*

Many of Mr. Hannigan's business dealings through PPI were documented through contracts. ECF. No. ¶ 5. A standard form contract for this relationship included a "Liability Limitations" paragraph in subsection C "Tax Filings," noting that the parties agreed that "Based on Information provided by the Customer, [PPI] will be responsible for applicable payroll tax deposits filings and reconciliations. [PPI's] sole liability to Customer or any third party for claims is to furnish a correct report or data and to correct Customer's records or tax agency filings." *Id.*

The facts underlying Mr. Hannigan's fraudulent scheme are as follows. Beginning in or around January of 2012, Mr. Hannigan began under paying the IRS for taxes owed by his clients. ECF. No. 1 at ¶ 11. Mr. Hannigan repeatedly overstated deposits he made to pay taxes owed by his clients to the IRS. *Id.* at ¶ 12. Between 2011 and 2016, Mr. Hannigan falsely filed over one hundred Form 941s[1] reporting he deposited more money to pay tax debt than he ever actually sent to the IRS. *Id.* This caused Mr. Hannigan's victims to collectively underpay the IRS approximately $3,270,566.89. *Id.* To conceal this scheme from his victims, Mr. Hannigan presented his victims with "bogus documents" that showed confirmation of payment of taxes he made on their behalf to the IRS. *Id.* Mr. Hannigan's clients gave him access to all necessary funds to pay their taxes in full, but since Mr. Hannigan failed to pay 100% of the tax debt to the

---

[1] Businesses are required to prepare and file a Form 941, entitle Employer's Quarterly Federal Tax Return, with the IRS. Form 941 details employee wages that were paid by a company and income tax withheld and paid over to the IRS based on those employee wages. ECF 1 ¶ 2.

IRS, his clients were subjected to interest payments and penalties for the tax delinquency. ECF. No. 9 at 5.

Since Mr. Hannigan realized this conduct would lead the IRS to contact his victims, Mr. Hannigan rerouted IRS notices from his victim's business address to PPI's business address. ECF. No. 1 at ¶ 12. By changing the mailing address, Mr. Hannigan was able to prevent his victims from discovering the scheme for several months and in some cases years. *Id*. Moreover, Mr. Hannigan gave some clients documents that he claimed were confirmation of payments he made to the IRS on their behalf through the Electronic Federal Tax Payment System (EFTPS). ECF. No. 9 at 10. But these documents were false and contained fake confirmation numbers and showed payments to the IRS that were never made. *Id.* Mr. Hannigan, in one incident, gave a client a PDF of a fraudulent check that he claimed was being held in escrow and that the funds would soon be used to make a payment, but the check was never issued to Mr. Hannigan on the date alleged or in the amount alleged—the check was a charade. *Id.*

Additionally, Mr. Hannigan submitted multiple false IRS Form 2848s, entitled "Power of Attorney and Declaration of Representative" to the IRS. ECF. No. 1 at ¶ 12(C). These forms falsely claimed that Mr. Hannigan's clients had given him power of attorney over their dealings with the IRS. *Id*. On multiple occasions, Mr. Hannigan represented himself to be a Certified Public Accountant ("CPA") on Forms 2848s, giving Mr. Hannigan greater access to his clients IRS accounts under IRS regulations. ECF. No. 1 at ¶ 12(D). These actions violated Title 26, United States Code, Section 7212(a).

Specifically, in furtherance of this scheme, Mr. Hannigan:

(1) On or about May 21, 2015, Mr. Hannigan showed Victim/Company 2 a false
document alleging a tax payment of $15, 475.83 that he never remitted to the IRS.
(ECF. No. 1 at ¶ 12 B.1.)

(2) On or about May 21, 2015, Mr. Hannigan showed Victim/Company 3 a false
document alleging a tax payment of $125,423.69 that he never remitted to the IRS.
(ECF. No. 1 at ¶ 12 B.1.)

(3) On or about March 11, 2015, Mr. Hannigan emailed to Victim/Company 4 a false
document alleging a tax payment of $157,501.57 that he never remitted to the IRS.
(ECF. No. 1 at ¶ 12 B.1.)

(4) On or about April 17, 2015, Mr. Hannigan sent to Victim/Company 4 a false
document alleging a payment of $138,639.59 that he never remitted to the IRS. (ECF.
No. 1 at ¶ 12 B.1.)

(5) On or about February 5, 2016, Mr. Hannigan sent to Victim/Company 5 a false
document alleging a tax payment of $163,890.82 that he never remitted to the IRS.
(ECF. No. 1 at ¶ 12 B.1.)

Furthermore, Mr. Hannigan purposefully presented multiple false Form 941, Service
Employer's Quarterly Federal Tax Return, to the IRS. The table below shows seventeen different
occasions Mr. Hannigan recorded a false amount on the Form 941 Line 41 "Total Deposit" and
instead actually deposited substantially less and in some cases nothing at all. ECF. No. 9 at 5.

| Count | Period Ended | Business Entity | Tax Assessed, Per Return | Total Deposit Per Return | Actual Deposit | Difference |
|---|---|---|---|---|---|---|
| 2 | 6/30/2013 | Victim 1 | $392,023.99 | $392,023.99 | $264,645.22 | $127,378.77 |
| 3 | 9/30/2013 | Victim 1 | $315,811.41 | $315,811.41 | $179,867.00 | $135,944.41 |
| 4 | 12/31/2013 | Victim 1 | $411,090.89 | $411,090.89 | $54,773.76 | $356,317.13 |
| 5 | 12/31/2013 | Victim 2 | $13,554.59 | $13,554.59 | $3,274.49 | $10,280.10 |
| 6 | 3/31/2013 | Victim 2 | $9,150.42 | $9,150.42 | $8,104.54 | $1,045.88 |
| 7 | 3/31/2013 | Victim 3 | $17,597.78 | $17,597.78 | $17,548.40 | $49.38 |
| 8 | 6/30/2013 | Victim 3 | $17,242.80 | $17,242.80 | $16,615.74 | $627.06 |

| 9 | 9/30/2013 | Victim 3 | $19,961.58 | $19,961.58 | $19,199.74 | $761.84 |
| 10 | 12/31/2013 | Victim 4 | $41,281.06 | $41,281.06 | $6,376.95 | $34,904.11 |
| 11 | 3/31/2014 | Victim 4 | $40,274.21 | $40,274.21 | $21,773.27 | $18,500.94 |
| 12 | 6/30/2014 | Victim 4 | $40,16.06 | $40,161.06 | $2,619.33 | $37,541.73 |
| 13 | 930/2014 | Victim 4 | $39,588.65 | $21,326.52 | $9,260.60 | $12,065.92 |
| 14 | 6/30/2014 | Victim 5 | $67,380.20 | $67,380.20 | $17,706 | $49,674.14 |
| 15 | 9/30/2014 | Victim 5 | $90,748.90 | $43,012.28 | $23,660.60 | $19,351.68 |
| 16 | 12/31/2014 | Victim 5 | $173,639.50 | $173,639.50 | None | $173,639.50 |
| 17 | 3/31/2015 | Victim 5 | $82,834.79 | $82,834.79 | None | $82,834.79 |
| 18 | 6/30/2015 | Victim 5 | $93,732.27 | $93,732.27 | None | $93,732.27 |

The above table only includes seventeen falsified transactions and accounts for the $1,154,649.65 Mr. Hannigan stole from Victims 1-5. ECF. No. 9 at 6. The list below summarizes the tax debt each victim owed the IRS due to Mr. Hannigan's criminal conduct. It is important to note that these figures do not include interest payments and penalties that continue to hamper the victims and devastate their livelihoods.

| Victim 1 | $619,640.31 |
| Victim 2 | $37,489.27 |
| Victim 3 | $49,133.05 |
| Victim 4 | $144,567.11 |
| Victim 5 | $598,700.80 |
| Victim 6 | $421,433.62 |
| Victim 7 | $125,852.95 |
| Victim 8 | $37,232.31 |
| Victim 9 | $420.738.14 |
| Victim 10 | $38,955.09 |
| Victim 11 | $72,115.13 |
| Victim 12 | $40,241.17 |
| Victim 13 | $7,845.42 |
| Victim 14 | $81,141.80 |
| Victim 15 | $120,371.59 |
| Victim 16 | $4,727.02 |
| Victim 17 | $26,740.40 |
| Victim 18 | $61,943.11 |
| Victim 19 | $54,344.87 |
| Victim 20 | $39,055.07 |
| Victim 21 | $3,470.48 |
| Victim 22 | $4,891.31 |
| Victim 23 | $30,063.80 |
| Victim 24 | $3,030.90 |

| Victim 25 | $3,085.10 |
|-----------|-----------|
| Victim 26 | $10,137.32 |
| Victim 27 | $269.75 |
| Victim 28 | $5,086.57 |
| Victim 29 | $25,014.65 |
| Victim 30 | $2,388.01 |
| Victim 31 | $9,119.91 |
| Victim 32 | $4,712.31 |
| Victim 33 | $68,147.32 |
| Victim 34 | $9,103.34 |
| Victim 35 | $39,778.07 |

These intentional acts prolonged Mr. Hannigan's scheme and enabled him to steal millions of dollars from clients who had trusted him to help their business. Instead of helping local businesses, Mr. Hannigan falsified numerous IRS forms, falsely claimed clients had given him POA, falsely represented himself to be a CPA, lied to clients, and ultimately "destroyed several businesses, families and lives." ECF No.1 & ECF No. 48.

As previously mentioned, Mr. Hannigan's victims primarily consisted of small and medium sized businesses in the Delaware County area. ECF. No. 9, 10 & 48. Many of these businesses are still recovering from Mr. Hannigan's crime. ECF. No. 48. Prior to sentencing, multiple Victims testified in the grand jury and described how they discovered the tax deficiency, confronted Mr. Hannigan, and were lied to by Mr. Hannigan. ECF. No. 9. Some of these instances are described in detail below.

Victim 5 is a residential heating and air conditioning contractor located in West Chester, Pennsylvania. ECF. No. 9 at 7. Victim 5 was a longtime friend of Mr. Hannigan spanning back to high school and Mr. Hannigan was in Victim 5's wedding. *Id*. In 2008, Victim 5 started his own business and hired Mr. Hannigan to provide payroll services. *Id*. Then in "late-2014, or early-2015" a Pennsylvania state tax agent approached him at his office and reported, "the state never received the payroll taxes, which I thought was being paid through the payroll

company…[and] [s]he also let me know at that point that there were multiple clients of PPI that she was personally handling that also did not pay their local and state taxes." *Id*. When Victim 5 contacted Mr. Hannigan about the incident, Mr. Hannigan "kind of gave me a little but of a run around about how there was a mistake…[h]e apologized for any mistakes and he kind of brushed it off like sorry about it, we'll get it taken care of." *Id*. After this incident, Victim 5 continued to get notices from the IRS and confronted Mr. Hannigan. *Id*. Victim 5 explained, "I actually went to his office on two occasions and actually sat in his conference room and made him call the IRS on my behalf to actually see that he was actually trying to do something. Nothing got resolved at that point…it was a bit of a shell game in my opinion." *Id*.

Mr. Hannigan also changed the business mailing address of Victim 5's company to Mr. Hannigan's office without Victim 5's knowledge. *Id*. Ultimately Victim 5 did not know there was a tax problem until it was too late to fix. *Id.* at 8. As a result of Mr. Hannigan's crime, Victim 5 not only lost $598,700.80 to Mr. Hannigan's theft, but Victim 5 also had to pay that amount to the IRS as well as an additional $45,000 to the state for interest and penalties. ECF. No. 9 at 7.

Victims 2 and 3 are two companies owned by the same person. (Hereinafter Victim 2&3) ECF. No. 9 at 9. Victim 2&3 testified that he is a plumbing and heating contractor from Media, Pennsylvania, who has been in business for 40 years. *Id*. Victim 2&3 began working with Mr. Hannigan in the summer of 2012. *Id*. Then in late-2013, Victim 2&3 explained that "I started to receive some notices [from the IRS.]" *Id*. About a year later, at a business lunch, "some of the guys start talking and [Mr. Hannigan's] name came up. They were saying how some of the other people were getting notices from the IRS that their taxes weren't paid and that there were issues and problems. At that time, you kind of get a sick feeling in your stomach." *Id*. Victim 2&3

decided to do his own research into the status of his taxes and "discovered that there was a lot of money missing and a lot of tax liability falling onto" his businesses. *Id*. When Victim 2&3 confronted Mr. Hannigan, he learned that Mr. Hannigan "had actually incorporated himself into the IRS as being the lead person for [my companies]. So, the IRS was sending everything to him…I gave him authority…to take assets out of my bank account only…but not to change everything." *Id*.

Mr. Hannigan's crime created a myriad of business problems for Victim 2&3. To address his tax problem, Victim 2&3 changed the name of his businesses. Although this helped Victim 2&3 separate himself from his tax liabilities in the eyes of the IRS, it prevented Victim2&3 from bidding on any public contracts in Delaware County because a business must be active in Delaware County for five years before they can make a bid for a public contract. *Id*. Furthermore, Victim 2&3 explained that the change of business names, "affects everything: new business cards, new stationary, new company logo, new uniform for the guys…I had to hire an attorney. I had to pay another payroll company to go through and redo my quarterly reports…it was just a lot of aggravation…it's just a nightmare." *Id*. Victim 2&3 faced these unnecessary administrative cost and reputational harm in addition to his two businesses' $86,622.32 of combined debt to the IRS as well as the interest and penalties on those taxes.

Victim 1 had a similar experience dealing with Mr. Hannigan as Victim 5 and Victim 2&3. Victim 1 testified that his business operates out of Glenolden, PA and does "large scale heating, ventilation, air conditioning and plumbing" work on commercial properties, as well as "a service company that services…the mechanical construction we do." ECF. No. 9 at 8. Victim 1 started his business in 1997 and began working with Mr. Hannigan in 2001. *Id*. Victim 1 explained, "everything was perfect" until the spring of 2012 when "[w]e had an IRS agent come

to the office and ask to talk to me…[s]he said that there was a problem with the return and that some taxes weren't properly paid. I picked up the phone while she was in my office and called [Mr. Hannigan] and said 'what's going on'… He said that the IRS is screwed up and they probably mixed up your two companies." *Id*. On that day, Victim 1 learned that Mr. Hannigan had changed his business address to PPI's office in Media. *Id*. Victim 1 had never authorized that change and ensured all future IRS notices were sent to his business. *Id*.

After receiving notice from the IRS, Victim 1 began to confront Mr. Hannigan and "his lies started to catch up with him[.]" *Id*. Victim 1 left PPI in the fall of 2013 but this did not prevent Mr. Hannigan's conduct from further hurting Victim 1 in a variety of ways. For example, Victim 1, "did a job at the McGuire Air Force Base…Our monthly application of about $100,000 – when we were looking for payment, we got $69,000 and they said they were withholding $31,000 and change because of payroll tax shortage. So, they deducted $31,000 from our payment." *Id*.

In 2021, Victim 1 submitted a Victim impact statement regarding Mr. Hannigan's first Motion for Reconsideration. ECF. No. 48. Victim 1 described the damage Mr. Hannigan's crime had caused for him and his business that persist to this day.

> [Mr. Hannigan] stole more money from me than anyone else. Unfortunately, you can't put a price on sleepless nights or constant worry about the IRS threats and liens that were issued to us on a regular basis. What Myles put me through (and I assume all others) is indescribable and forever damaging. Worrying about the IRS shutting down your business because of a thief is the worst pressure I've ever experienced…None of us are out of financial jail because of his actions, allowing him out of jail because of the pandemic should not be an option either!

ECF. No. 48. Several other victims of Mr. Hannigan's crimes submitted Victim Impact Statements that will be addressed later.

    B.  <u>Mr. Hannigan's Substance Abuse</u>

Mr. Hannigan's crimes coincided with his substance abuse. Mr. Hannigan reported that he first consumed alcohol at the age of fourteen and that he reportedly drank "a lot on the weekends" throughout his teens and twenties. See PSR ¶ 79. Although Mr. Hannigan views his childhood as "idyllic," Stephanie Hannigan, his wife, tells a different story. ECF. No. 18. Ms. Hannigan stated that Mr. Hannigan had a "darker" family history and that Mr. Hannigan's father, John Hannigan, was a "barely-functioning alcoholic" and who drank daily. *Id*. Ms. Hannigan explained that Mr. Hannigan had always had "a bit of a drinking problem" but that drinking problem intensified in 2005. *Id*.

Mr. Hannigan's abusive alcohol usage continued throughout his thirties and forties and by 2015 Mr. Hannigan had incurred three Driving Under the Influence (DUI) arrests in 1998, 2007, and 2015. *Id*. In his first DUI, Mr. Hannigan had struck another vehicle while speeding through a redlight. PSR ¶ 55. Then during his second DUI, Mr. Hannigan fell asleep behind the wheel of his vehicle while it was still in drive. PSR ¶ 49. When officers arrived at the scene Mr. Hannigan's Blood Alcohol Content (BAC) was recorded at .193%, over double the legal limit. PSR ¶ 49. During Mr. Hannigan's third DUI, an officer pulled him over for not using a turn signal. PSR ¶ 50. When the officer approached the car, he noticed Mr. Hannigan smelled of alcohol and had an open bottle of Smirnoff Vodka placed adjacent to the center counsel. See PSR ¶ 50.

Mr. Hannigan stated that his alcohol use was "becoming a serious issue" after his second DUI in 2007. *Id*. This issue was amplified following the death of Mr. Hannigan's father in 2012. *Id*. Mr. Hannigan stated that around this time he was "leaving work early to go drinking" and that his drinking has had a serious impact on his social and familial relationships. *Id*. Mr. Hannigan drank alcohol daily and drank to the point of intoxication. *Id*. According to Ms.

12

Hannigan, Mr. Hannigan began a "seven-year death spiral" and "went off the rails." ECF. No. 18.

According to Mr. Hannigan, in December of 2018, he was suffering from severe depression because of his crimes and was "probably suicidal." See PSR ¶ 76. Mr. Hannigan explained that in December he had an incident in which his family was concerned for his safety and requested that he undergo an emergency psychological assessment at Mercy Fitzgerald Hospital crisis center. *Id.* Mr. Hannigan resisted, and the hospital did not authorize an involuntary commitment order, so he was subsequently released. *Id.* Shortly after his discharge, Mr. Hannigan experienced an alcohol-related seizure while leaving the crisis center and was admitted to the main hospital for medical treatment. *Id.*

On December 21, 2018, Mr. Hannigan was admitted to the Clearbrook Treatment Center (inpatient) in Wilkes Barre, Pennsylvania. See PSR ¶ 80. Mr. Hannigan was discharged on January 14, 2019, and transferred to a sober living house, Independence Lodge (operated by Banyan Treatment Services), located at 2915 Century Lane in Bensalem, Pennsylvania. *Id.* Mr. Hannigan remained at Independence Lodge until he returned to his residence in Newtown Square in February 2019. In July 2019 Mr. Hannigan relapsed (following his guilty plea in this underlying case) and was readmitted to the Clearbrook Treatment Center on July 31, 2019. *Id.* There Mr. Hannigan completed a five-day inpatient program, before attending a partial hospitalization program at the Banyan Treatment Center in Langhorne from August 5, 2019, until September 4, 2019. *Id.* He was subsequently placed at the Independence Lodge Sober Living House in Bensalem where he remained until he was transferred to prison. *Id.* Prior to 2018, Mr. Hannigan was reluctant to go to treatment for several years, but now he believes that he "needs help" and attends Alcoholic Anonymous meetings daily. See PSR ¶ 50.

13

Now on November 3, 2021, in his second Motion for Reconsideration Mr. Hannigan states that, "since being incarcerated, [he] has actively and enthusiastically participated [in] rehabilitation and programming, proving his prior acceptance of responsibility and commitment to his victims, to be sincere and steadfast." ECF. No. 59. Mr. Hannigan has stated that "[u]pon entering RDAP I had already determined that abstinence from alcohol was my best chance to salvage my life...In fact, upon entering federal prison in February 2020, I had already made a pledge to abstinence and had been sober for approximately 7 months." See ECF No. 76 attach. 2 ¶ 2. Mr. Hannigan continued to say that "[t]he solitude and isolation of prison only hardened my resolve to live an alcohol-free life. Now...I have been sober for over 2 years, the longest period of sobriety in my life." *Id*. While in prison, Mr. Hannigan states he is making progress and rebuilding relationship that he had thought destroyed as well as actively participating in several rehabilitation programs.[2] *Id*.

Mr. Hannigan has not discussed his Victims or the impacts his action had on his Victims in depth in his Motions for Compassionate release. See ECF. No. 27, 37, 59. But when asked, "[w]hat was difficult about giving up alcohol?" Mr. Hannigan stated:

> Previously I've tried several times to quit alcohol and not been successful. Looking back on those times, I was never really all that serious about my commitment to quit. As the weight of my crimes and victim impact grew heavy on my mind quitting alcohol seemed impossible, it was my only daily respite. It wasn't until I began to share the true extent of my crimes and the pain, I caused my family and victims, that abstinence seemed possible. Today, I am sober over two years, the longest period of sobriety since the age of 14.

---

[2] Since going to prison Mr. Hannigan has completed several rehabilitation programs including: (1) Residential Drug Abuse Program, (2) Non-Residential Drug Abuse Program (NRDAP), (3) Seeking Safety – PTSD Recovery, (4) Criminal Thinking (5) Money Smart (6) Parenting I, (7) Parenting II, (8) Education Department Tudor (Part-time), (9) Warehouse Employee (Full-time), (10) Managing Diabetes, (11) VT Personal Training, (12) Brain Health, (13) Catholic Mass, (14) Narcotic Anonymous, and (15) Alcoholics Anonymous. ECF No. 59.

14

See ECF No. 76 attach. 2. Mr. Hannigan's time in prison has helped him maintain sobriety and set the stage for a recovery and create a potential pathway for him to establish a healthy, substance free life.

    C.  <u>Mr. Hannigan's Sentencing</u>

As previously mentioned, Mr. Hannigan pleaded guilty to Count 1: Obstructing the Due Administration of the Internal Revenue Service (IRS), in violation of 26 U.S.C. § 7212(a), and to Counts 2 through 18: Aiding and Assisting the Filing of False Federal Tax Returns, in violation of 26 C.S.C. § 7206(2). ECF No. 10 at 1. The maximum sentence for violation of 26 U.S.C. § 7212 is 3 years in prison, 1 year of supervised release, a fine of $250,000, and a special assessment of $100. ECF. No. 9 at 3. The maximum sentence for violation of 26 § 7206 is 3 years in prison, 1 year of supervised release, a fine of $250,00, a special assessment of $100. *Id.* The *total maximum punishment* for Counts 1 through 18 is up to 54 years in prison, 1 year of supervised release, a fine of $4,500,000 and a special assessment of $1,800. *Id.*

In Mr. Hannigan's Pre-Sentencing Report, it was determined he had a total offense level of 21 and a criminal history category of III. See PSR ¶ 92. Based on those factors, the guideline imprisonment range is 46 months to 57 months. See PSR ¶ 92. Although Mr. Hannigan victimized 35 individuals, he is charged with crimes against the IRS and not those victims who trusted him with their money. So, his guideline range was compassionate in and of itself given the fact that he was not charged in this indictment with crimes against the 35 individuals and businesses that created significant financial, personal, and emotional havoc in those lives which left them alone to deal with the full collection enforcement efforts of the IRS that were brought to bear upon them because they engaged the services of a charlatan.

Ultimately, Mr. Hannigan was sentenced to 52 months in prison with a term of 16 months for Count 1, and a term of 36 months for Counts 2 through 18. Mr. Hannigan was also recommended to be placed in the Residential Drug Abuse Program ("RDAP") while in custody of the BOP. ECF No. 27 at 2. The completion of RDAP reduced Mr. Hannigan's sentence by a full 12 months, making his sentence time 40 months. Moreover, Mr. Hannigan is required to pay $3,270,566.89 in restitution to victims with a special assessment of $1,800. ECF No. 10 at 1. To date, Mr. Hannigan has not completed a single payment owed to his victims. ECF. No. 48.

As indicated, since his sentencing date, Mr. Hannigan filed a Motion for Compassionate Release (ECF. No. 29.) on May 13, 2020, a Motion for Reconsideration (ECF. No. 37) on March 4, 2021, and now a second Motion for Reconsideration (ECF. No. 59) on November 3, 2021. Mr. Hannigan has filed a Motion for Compassionate Release three times in an eighteen-month period.

In Mr. Hannigan's first Motion for Compassionate Release on May 13, 2020, he argued that based on his preexisting health conditions he was "particularly vulnerable to the coronavirus (COVID-19)" and therefore had an "extraordinary and compelling reason" for a reduction in his sentence. ECF. No. 29. This Court rejected Mr. Hannigan's first Motion because Mr. Hannigan had only served 5 months of his sentence and "taking all relevant facts into account, reducing Defendant's sentence to only five months from 52 months would not appropriately reflect the nature and circumstances of his offenses, promote just punishment, [n]or afford adequate deterrence to criminal conduct." See ECF. No. 33.

Then less than a year later on March 4, 2021, Mr. Hannigan filed a Motion to Reconsider. ECF. No. 37. In this motion, Mr. Hannigan argued his pre-existing conditions and deteriorating health conditions presented an "extraordinary and compelling reason" for a reduction in his

sentence. *Id*. Again, this Court rejected Mr. Hannigan's Motion for Reconsideration because when considering all relevant factors shortening "Mr. Hannigan's sentence would not appropriately reflect the nature and circumstances of his offense, promote just punishment, [n]or afford adequate deterrence to future criminal conduct." ECF. No. 56 at 19.

On November 3, 2021, Mr. Hannigan filed this, his second Motion to Reconsider, which is, in effect, his third Motion for Compassionate Release in eighteen months. Despite filing three separate Motions for Compassionate Release, Mr. Hannigan has yet to express real remorse for his Victims or the crimes he committed. His focus remains on his health and his freedom and not the devastation he caused to his victims.  In all three motions, Mr. Hannigan points to his deteriorating health and his own personal progress with addiction as reasons for a sentence reduction but fails to address the impact his crimes had on his victims or the chaos he caused within his own nuclear family.

### D.  Statements from Mr. Hannigan's Victims

Prior to Mr. Hannigan's sentencing, several victims submitted impact statements detailing how their lives and businesses were negatively impacted by his crimes. See ECF No. 48. The Court provided an opportunity following Mr. Hannigan's first Motion for Reconsideration for victims to submit statements. Eleven former clients wrote to the Court to express their opposition to Mr. Hannigan's request. ECF No. 48. Several said that they are still resolving penalties, interest, and other issues with the IRS stemming from his crimes. ECF No. 48 at 1-4. Now, less than a year after these Victim Impact Statements were submitted Mr. Hannigan is again requesting an early release. The Victim Impact statements from March of 2021 are applicable to this proceeding and demonstrate Mr. Hannigan's inward focus on his

health and his need to be released rather than fully serving the time for the crimes he committed. Specifics of the Victim Impact Statements are discussed below.

One Victim of Mr. Hannigan's crime stated, "we would see Myles early release as a complete miscarriage of justice, as well as a giant slap in the face to all the victims he so casually preyed upon for years and years destroying businesses, families and lives." ECF No. 48. Another Victim stated, "[t]o this day, we still have penalties, interest and problems with the IRS. Nobody is offering "compassionate help" for the victims. Why should the guy who caused all the problems get special treatment[?]" *Id*. Several Victims stressed the negative impact Mr. Hannigan's crimes had on their business; one Victim even said their business would "likely never recover from being shut down" for failure to pay taxes. *Id*.

Mr. Hannigan's victims included a food pantry that has struggled for well over 4 years to manage their finances after Mr. Hannigan's theft. As well as one business owners who was close to retirement and said, "[Mr. Hannigan] theft of $154,000.00 from me resulted in my cancelling my retirement for at least another 8 years. I believe it is a great miscarriage of justice to allow him his freedom when I am forced to work these many more years to replenish my nest egg."

Several of Mr. Hannigan's victims expressed a sense of anger and injustice at the thought of Mr. Hannigan's early release. The sentiment of "Do the crime…do the time" was common in the Victim Impact statements. As one Victim explained, "I do not believe that the comfort of home and family Mr. Hannigan would enjoy on home confinement would have the same impact that his continued incarceration will have to consider the enormity of the consequences and hardships his actions have causes to so, so many people."

E.  Mr. Hannigan's Health History

Mr. Hannigan has an extensive health history as detailed in the Court's previous two memorandums (ECF No. 33; ECF No. 56). This Court will again provide a detailed analysis of Mr. Hannigan's health history including his health conditions pre and post sentencing.

On June 30, 2006, Mr. Hannigan had a cardiac catheterization procedure which required six stent implants. See PSR ¶ 70, ECF. No. 29. Following this procedure Mr. Hannigan was diagnosed with hypertension and coronary artery disease. See PSR ¶ 70, ECF. No. 29. Around this time, Mr. Hannigan was also diagnosed with gastroesophageal reflux, and high cholesterol. See PSR ¶ 70. The procedure and the diagnoses coincided with Mr. Hannigan's substance abuse "becoming a serious issue" in 2005. PSR 79 & ECF. No. 18. As Ms. Hannigan explained, Mr. Hannigan had always had "a bit of a drinking problem" but that drinking problem intensified in 2005. ECF No. 18. Only six months after his cardiac catheterization procedure, Mr. Hannigan fell asleep behind the wheel of his car while under the influence of alcohol and was arrested for his second DUI. PSR No. 49. At the time of his arrest, Mr. Hannigan recorded a BAC of .193%. *Id*.

Six years later, in September of 2012, Mr. Hannigan was diagnosed with diabetes. ECF. No. 29. Again, this coincided with Mr. Hannigan's substance abuse. Mr. Hannigan's father had passed away in 2012 and Mr. Hannigan was drinking "even more than usual." PSR ¶ 79. Mr. Hannigan stated that around this time he was "leaving work early to go drinking" and that he preferred to drink Vodka and would drink until the point of intoxication daily. PSR ¶ 79. Furthermore, according to Ms. Hannigan, in 2012 Mr. Hannigan began sneaking out in the middle of the night to drink. ECF No. 18.

Mr. Hannigan's substance abuse worsened and in 2015 and he received his third DUI. PSR ¶ 55. Mr. Hannigan still did not seek treatment for his alcoholism and in his own words

stated "[l]ooking back on those times, I was never really all that serious about my commitment to

quit [drinking]." In 2017, Mr. Hannigan underwent a penile implant procedure to help his

erectile dysfunction. See PSR ¶ 72. Then in December 2018 Mr. Hannigan suffered an alcohol

induced seizure. PSR ¶ 75. The seizure was the direct result of Mr. Hannigan's alcohol abuse.

PSR ¶ 75. Following his seizure, Mr. Hannigan began a rehabilitation program but relapsed in

home confinement in July 2019. PSR ¶ 80. After his relapse Mr. Hannigan returned to the

Clearbrook Treatment Center on July 31, 2019, and has remained sober since that day. PSR ¶ 80.

      In addition to his physical health, Mr. Hannigan reported that he attended mental health

counseling with a psychiatrist, Dr. Donald Haupt, in Bryn Mawr, Pennsylvania, from 2010 until

2016. While attending mental health counseling, Mr. Hannigan was diagnosed with attention

deficit hyperactivity disorder (ADHD) and was prescribed "amphetamine salts" and Wellbutrin

to help treat this condition. PSR ¶ 76. At first, Mr. Hannigan attended therapy sessions

approximately once a month, but Mr. Hannigan's commitment to mental health treatment began

to deteriorate as his alcoholism worsened. Mr. Hannigan reported that he ceased regular

treatment for his mental health after approximately three years. *Id*. Mr. Hannigan completely

stopped regular treatment for his mental health when he "went off the rails" and his substance

abuse was "becoming a serious issue." See PSR ¶ 76, 79 & ECF No. 18. Mr. Hannigan's mental

health continued to deteriorate as his substance abuse increased. According to Mr. Hannigan, in

December 2018, he was suffering from severe depression and was "probably suicidal." See PSR

¶ 76.

      Mr. Hannigan was sentenced on February 14, 2020, and at that time the U.S. Probation

Office stated that Mr. Hannigan's "physical and medical conditions do not appear to present an

issue for sentencing, institutional classification, or community supervision." PSR. ¶ 74. But since

going to prison Mr. Hannigan has raised several issues about his physical wellbeing and treatment by BOP medical staff.

Mr. Hannigan has repeatedly stressed that his preexisting conditions make him more vulnerable to the Covid-19 Virus. ECF No. 27, 39 & 59. But Mr. Hannigan received his first dose of the Moderna COVID-19 vaccines on January 28, 2021, and his second dose on February 25, 2021. ECF No. 68 at 137. According to CDC guidelines, Mr. Hannigan is considered "fully vaccinated" against the COVID-19 virus. ECF No. 56. Furthermore, on December 8, 2021, Mr. Hannigan received a Moderna COVID-19 vaccine booster shot which should prevent any "waning efficacy" of the COVID-19 vaccine. ECF No. 73. Mr. Hannigan also received immunization against influenza on September 30, 2021. ECF No. 68 at 137.

On May 13, 2020, in his first Motion for Compassionate release, Mr. Hannigan stated that he suffered from hypertension, diabetes, latent tuberculosis, coronary artery disease, sleep apnea, and a "compromised immune system – caused by alcohol abuse." ECF No. 29. Mr. Hannigan had not reported his sleep apnea in his Presentence Report and was not diagnosed with latent tuberculosis until after he arrived at FDC – Philadelphia. *Id*. BOP Medical Record dispute Mr. Hannigan's claim that he was previously diagnosed with sleep apnea. See ECF 76 attach. 1 at p. 5. Mr. Hannigan also claimed to be suffering from heart palpitations and chest pain, which he made aware to BOP medical staff on 3/22/2020 and 3/29/2020. *Id*.

Despite Mr. Hannigan's claims that he did not receive adequate treatment for his chest pain, Mr. Hannigan's medical records show that he had a consultation about his chest pain on May 20, 2020. *Id* at 8. In fact, Mr. Hannigan is a Chronic Care Clinic patient and receives regular medical care and attention from BOP Health Services. *Id*. According to the Government, "the FDC is repeatedly communicating with [Mr.] Hannigan about the status of his overall

health." See ECF No. 68. Mr. Hannigan also received medical attention on March 20, 2020,

when the BOP medical staff treated a skin rash Mr. Hannigan developed. See ECF No. 30.

Then in his first Motion for Reconsideration on March 4, 2021, Mr. Hannigan stated that

in addition to his preexisting conditions, his "diabetes [had] worsened resulting in a bone

infection in [his] second toe on [his] right foot. This led to a partial amputation of the toe." ECF.

No. 37. Mr. Hannigan stated, "In November of 2020, I presented at the Lewisburg Camp

Medical Office with an open wound on the second toe of my right foot…this injury resulted in a

bone infection that led to a partial amputation of the toe." *Id*. This condition is called

Osteomyelitis. On January 27, 2021, doctors performed "a right second toe distal phalanx

amputation, [this] is a prophylactic procedure to permit normal gait of a diabetic patient,

involving amputation of the distal phalanx of the second toe (next to the great toe). That is the

part of the toe at the end, below the toenail." ECF. No. 42. Mr. Hannigan's claim that the bone

infection was the result of "worsening diabetes" has not been substantiated. This procedure is

common for people *with* diabetes and requires an early and accurate diagnosis to prevent further

permanent damages around the infection which Mr. Hannigan received. See Giurato et al.,

*Osteomyelitis in diabetic foot: A comprehensive overview*, WORLD JOURNAL OF DIABETES (April

4, 2015).

On November 3, 2021, Mr. Hannigan again asserted that his health conditions have been

deteriorating but offers no evidence to support that assertion. See ECF No. 59. Specifically, Mr.

Hannigan points to three different instances where he believed the medical care provided to him

in prison was "less th[a]n adequate." *Id*. First, Mr. Hannigan cites the emergence of

"experiencing new left sided chest pain, consistent with the pain experienced just prior to cardiac

stent implantation" he had in June 2006 and claims the prison has not provided a stress test or

cardiologist consultation. See ECF No. 59 This claim is disputed by the Government, who stated

that Mr. Hannigan received a "stress test" and that "the results of the test were normal." ECF No.

66. Second, Mr. Hannigan states that the BOP continues to deny him "a CPAP machine for sleep

apnea" (ECF. No. 59) but according to the Government Mr. Hannigan failed a "take home sleep

test" which is why he does not have access to a sleep apnea machine. See ECF. No 66. Third,

Mr. Hannigan points to his amputated toe as an example of his deteriorating health. ECF No. 59.

As previously explained, this procedure is common for people with diabetes and the condition

was diagnosed early and accurately which prevented extensive permanent damage around the

toe.

Mr. Hannigan's alleged new conditions and "less th[a]n adequate" treatment in prison do

not account for the improvements Mr. Hannigan has made in his mental health as well as his

"compromised immune system – caused by alcohol." See ECF No. 59 & 29. Currently, Mr.

Hannigan is alcohol free for the longest time since he was fourteen years old which has benefited

his mental and physical well-being. PSR ¶ 79 and ECF 76 attach. 2. Mr. Hannigan has reported

positive progress regarding his mental health, as well as, shown newfound vigor to fight his

alcoholism which he previously lacked. ECF No. 76. To that end, Mr. Hannigan has completed

fifteen rehabilitation programs — including RDAP — and attends AA meeting's daily. ECF No.

59. Through these programs Mr. Hannigan has developed healthy habits that have improved Mr.

Hannigan's overall health and laid the foundation for a healthy substance free life after Mr.

Hannigan's release. ECF. No. 76 attach. 2.

F.   Character References

On December 8, 2021, in conjunction with Mr. Hannigan's second Motion for

Reconsideration, this Court received one character letter from Mr. Hannigan's wife supporting

23

his compassionate release. ECF No. 67. This letter urges the Court to transfer Mr. Hannigan to home confinement due to the family's financial and emotional struggles from Mr. Hannigan's imprisonment, as well as her husband's "serious medical issues" and potential COVID exposure. ECF No. 67 at 1.

## II.    LEGAL STANDARDS

Mr. Hannigan's *pro se* Motion for Reconsideration of Compassionate Release is pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). As amended by the First Step Act of 2018, 18 U.S.C. § 3582(c)(1)(A) allows courts to modify a term of imprisonment where (1) "extraordinary and compelling reasons warrant such a reduction," (2) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and (3) "after considering the factors set forth in [18 U.S.C.] section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 394–95 (E.D. Pa. 2020).

Defendants filing such a motion must have "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or have experienced a "lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *United States v. Rodriguez*, 451 F. Supp. 3d 392, 396 (E.D. Pa. 2020). Mr. Hannigan has fully exhausted all administrative rights to appeal through the Bureau of Prison. See ECF No. 58 at 3.

While Congress has not defined "extraordinary and compelling reasons," the United States Sentencing Commission issued a policy statement to describe qualifying circumstances. *See* U.S.S.G. § 1B1.13. Although the policy statement predates the First Step Act, the Third Circuit has articulated its persuasiveness in shedding light on what constitutes "extraordinary and

24

compelling." *See United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021) ("Because Congress reenacted the compassionate-release statute without any alterations to the phrase 'extraordinary and compelling reasons,' it was reasonable for the court to conclude that the phrase largely retained the meaning it had under the previous version of the statute.").

The Sentencing Commission policy statement sets out three specific "extraordinary and compelling reasons" based on the defendant's medical condition, age, or family circumstances. *See* § 1B1.13, cmt. n.1(A)–(C). Applicable "family circumstances" include "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children." § 1B1.13, cmt. n.1(C)(i). The Sentencing Commission also includes a "catch-all" provision, which allows a court to modify a sentence for "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 n.1(D); *see also United States v. Adeyemi*, 470 F. Supp. 3d 489, 509–510 (E.D. Pa. 2020) (Kearney, J.) (stating that the "catch-all" prevents courts from being "hamstringed because the Sentencing Commission has failed to update the pertinent guidance.").

Only if a defendant's circumstances qualify as "extraordinary and compelling," will the court look to the Section 3553(a) factors to determine whether Defendant is entitled to a reduction in sentence. 18 U.S.C. § 3582(c). Those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . . and (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The defendant bears the burden of proving by a preponderance of the evidence that the requested relief is warranted. *United States v. Jeffries*, No. CR 14-106, 2021 WL 2000555, at *7 (W.D. Pa. May 19, 2021).

A party seeking reconsideration of a motion for compassionate release must show either "(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010). "Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly." *Rossi v. Schlarbaum*, 600 F.Supp.2d 650, 670 (E.D. Pa. 2009).

## III.   DISCUSSION

### A.  Defendant's Second Motion for Reconsideration

In Defendant's current Motion for Reconsideration, Mr. Hannigan requests that this Court reduce his sentence to "time served" and transfer him to home confinement until October 22, 2022. ECF No. 59 at 1. The grounds for this request are four purported changed circumstances since the Court's April 22, 2021 Memorandum (ECF No. 56): (1) waning immunity from the Moderna COVID-19 vaccine; (2) Mr. Hannigan's deteriorating cardiac condition; (3) his completion of RDAP; and (4) his rehabilitation. ECF No. 59 at 1.

First, Defendant alleges that he is particularly vulnerable due to his pre-existing conditions and that the waning immunity of his Moderna vaccination puts him at "high risk of severe illness from COVID." ECF No. 59 at 1. Defendant adds that "even with a booster shot," the government endorsed (through The Cares Act) home confinement for "certain, non-violent, COVID vulnerable, inmates nearing the end of their sentence." ECF No. 59 at 1.

26

Second, Defendant describes his "immediate medical needs," which have allegedly been inadequately treated and could be better addressed in home confinement. ECF No. 59 at 1-2. Mr. Hannigan alleges that he is at "high risk for another cardiac event" as he suffers from diabetes, obesity, cardiovascular disease and other conditions. ECF No. 59 at 2. Mr. Hannigan goes on to list three instances in which he asserts the medical care provided was "less than adequate." ECF No. 59 at 2. In May 2020, medical personnel suggested that Mr. Hannigan be given a stress test due to his cardiovascular history and Defendant allegedly has yet to receive this stress test. ECF No. 59 at 2. Since his arrival at the BOP in February 2020, the Defendant claims that he has been wrongfully denied a CPAP machine to treat his sleep apnea. ECF No. at 2. Finally, Defendant complained of a lesion on his right second toe and was allegedly denied antibiotics that he claims would have prevented a partial amputation of the toe. ECF No. at 2.

Third, the Defendant lists the rehabilitation and programming that he has completed while in prison as persuasive factors towards compassionate release. ECF No. at 2. Finally, Defendant asserts that USP Lewisburg has been unwilling to follow the guidance in The Cares Act and that this Court should take this under consideration for equitable reasons, though the Court does not have any role in this determination. ECF No. 59 at 3. [3]

### B.  The Government's Response in Opposition

The Government's Response in Opposition alleges that Mr. Hannigan has been vaccinated and no longer presents "extraordinary and compelling reason" for compassionate release. ECF No. 66 at 1; 18 U.S.C. § 3582(c)(1)(A)(i). The Defendant received both doses of

---

[3] Mr. Hannigan has taken other approaches to obtain release under The Cares Act. He alleges that the BOP "gatekeeper" continues to "decline[] protection under The Cares Act," under which Mr. Hannigan has purportedly requested his release to home confinement. ECF No. 59 at 3. Mr. Hannigan also filed a habeas petition challenging the BOP's refusal to grant release under The Cares Act in the Middle District of Pennsylvania. ECF No. 59 at 3; ECF No. 76 at 5; *Hannigan v. Spaulding*, 4:21-cv-01784 (M.D. Pa.).

the Moderna vaccine early in 2021. ECF No. 66 at 2. The Government points out that this Court in its April 22, 2021 Memorandum and other courts nationwide have determined that vaccination reduces the risk of serious illness from COVID-19 thereby finding that the pandemic alone does not constitute an extraordinary and compelling reason for compassionate release. ECF No. 66 at 2-3; ECF No. 56. The Government goes on to cite Third Circuit cases supporting this view. ECF No. 66 at 3.[4]

In addition, the Government describes how effective USP Lewisburg has been in containing the spread and harmful effects of COVID-19 on its inmates. ECF No. 66 at 4. According to the Government, no inmate has died in this facility of COVID-19 and of the approximately 20% of the inmate population that did contract the virus, all have recovered. ECF No. 66 at 4. Over the past seven months, the facility has found only three positive cases with only one positive case at any given time. ECF No. 66 at 4.

The Government addressed the booster shot issue as well. The BOP has been administering boosters to inmates (ECF No. 66 at 5) and the Government supplemented its response by letter documenting that Mr. Hannigan had in fact received his Moderna COVID-19 vaccine booster shot on December 8, 2021 (ECF No. 73).

As for Mr. Hannigan's other health concerns, the Government contends that virtually all of his identified conditions existed at the time of sentencing and none support compassionate release. ECF No. 66 at 5. The Government acknowledges that a partial toe amputation occurred on January 27, 2021. ECF No. 66 at 5. However, there is no evidence that this occurred due to inadequate medical care. The Government also alleges that a stress test was performed on November 10, 2021 and the results were normal. ECF No. 66 at 6; ECF No. 64 at 3. The

---

[4] *See e.g.*, Garrett v. Murphy, 2021 WL 5026787 (3d Cir. Oct. 29, 2021); *United States v. Williams*, 2021 WL 4860170, at *3 (N.D. Ind. Oct. 19, 2021).

Government responds to Mr. Hannigan's request for CPAP machine to treat his sleep apnea by citing to this Court's April 22, 2021 Memorandum concluding that "Mr. Hannigan's sleep apnea and risk of infection are not sufficiently extraordinary and compelling to warrant compassionate release." ECF No. 56 at 15; ECF No. 66 at 6.

The Government contends that the only change in circumstances between Mr. Hannigan's last Motion for Reconsideration and now is that he has served more of his sentence and has a credit for good conduct time of four months. ECF No. 66 at 7. The Government reminds this Court of the seriousness and severity of the crimes Mr. Hannigan committed and the lingering negative impact it has on his victims. ECF No. 66 at 7-8.

C. Defendant's Response to Government's Opposition to Reconsideration of Compassion Release

In Response to the Government's Opposition, Mr. Hannigan reiterates in greater detail his continuing risk from COVID-19 and his numerous medical conditions. ECF No. 76. Mr. Hannigan contends that the spread of the new, highly transmissible omicron variant of COVID-19 and the vaccines mixed efficacy against it warrant compassionate release. ECF No. 76 at 1.[5] Mr. Hannigan also argues that the inmate turnover at his facility makes transmission of the virus "all but certain." ECF No. 76 at 1. Defendant goes on to complain that prisons in general are unable to contain the virus using recommended measures like social distancing, frequent disinfecting of surfaces, and frequent hand washing or sanitizing. ECF No. 76 at 1.

Defendant reiterates the seriousness of his pre-existing medical conditions as high-risk factors for severe illness from COVID-19. ECF No. 76 at 2. Those conditions, combined with his

---

[5] To support his claim, Mr. Hannigan cites to a number of statements made in the news, including NY Governor Kathy Hochul and Dr. Francis Collins of the National Institutes of Health, and a study from Oxford University.

age of fifty years old, and the "unknown" of the omicron variant allegedly make Mr. Hannigan more likely to be hospitalized and/or die from COVID-19 and create extraordinary and compelling circumstances for compassionate release. ECF No. 76 at 2.

The Court will briefly summarize the detail added by Defendant to his description of allegedly inadequate medical care for his sleep apnea, obesity, and Type 2 diabetes. ECF No. 76 at 2-4. Mr. Hannigan repeats his concern from his previous Motion for Reconsideration (ECF No. 37 at 2, 8) that the BOP has failed to issue a CPAP machine to treat his sleep apnea (ECF No. 76 at 2). Mr. Hannigan cites to a district court decision in which the request for compassionate release was denied because of § 3553(a) but the court found that "'prohibiting his use of a CPAP machine constitute[s] extraordinary and compelling reasons for a reduction in his sentence under 3582(c)(1)(A).'" ECF No. 76 at 2 (quoting *United States v. Nuzzolilo*, 517 F.Supp.3d 40 (D. Mass. Feb. 3, 2021)).

Defendant also cites sources and cases indicating that obesity puts Mr. Hannigan at higher risk from COVID-19 and warrants compassionate release. ECF No. 76 at 4; *see e.g.*, *United States v. Moe*, 2021 WL 5277202 (D.N.J. Nov. 12, 2021). Defendant further cites various sources indicating that Type 2 diabetes makes it more difficult for individuals to fight infection. ECF No. 76 at 4-5.

Finally, Defendant argues that vaccination is insufficient to eliminate his risk of infection from COVID-19 due to potential "[b]reakthrough infections" and that the booster may not be an effective solution either. ECF No. 76 at 5.

## IV.    Analysis

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), a court is permitted to modify a term of imprisonment after it has been imposed only under certain conditions, including extraordinary

and compelling reasons warranting such a reduction and following consideration of the

sentencing factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c).

A Motion for Reconsideration must also rely on one of the following: "(1) an intervening

change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear

error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir.

2010).

## A.  Extraordinary and Compelling Reasons

In its April 22, 2021 Memorandum (ECF No. 56), this Court considered Mr. Hannigan's

Moderna vaccination against COVID-19, his sleep apnea, and his partial toe amputation, among

other factors, and found that vaccination against COVID-19 decreased the risk of serious illness

or death from infection and those circumstances do not rise to the level of extraordinary and

compelling reason to warrant compassionate release. ECF No. 56 at 15. This Court finds that

developments since its April 2021 decision do not alter its conclusion. Considering Mr.

Hannigan's second Motion for Reconsideration, the Court finds that his pre-existing medical

conditions when considered in light of the threat of infection from the COVID-19, do not

constitute an extraordinary and compelling reason for release.

While Mr. Hannigan asserts that his waning immunity and the unknown efficacy of the

booster shot put him at heightened risk, the Court is persuaded by the Government's argument

that the combination of vaccination and recent booster shot significantly decreases the risk of

serious illness or death from COVID-19 infection. Even in the era of the highly transmissible

omicron variant, Moderna vaccination and booster shot is highly effective against severe illness.[6]

---

[6] *See e.g.*, Erika Edwards, *Booster shots effective against severe illness from omicron*, NBC News (Jan. 21, 2022
12:22 PM), https://www.cnbc.com/2022/01/21/booster-shots-effective-against-illness-from-omicron.html
("A booster dose of the Covid-19 vaccine significantly reduces a person's odds of hospitalization from the omicron

District Courts in the Third Circuit consistently agree that an FDA-approved vaccination against COVID-19 lessens the risk of serious illness or death from COVID-19 such that the threat of the pandemic, even combined with pre-existing medical conditions, does not constitute an extraordinary and compelling reason for compassionate release. *See e.g.*, *United States v. Bednarski*, 2022 WL 80080, at *5 (W.D. Pa. Jan. 7, 2022) (finding that defendant's vaccination and booster mitigates his risk despite his serious health conditions); *United States v. Berry*, 2021 WL 3537145, at *3 (E.D. Pa. Aug. 11, 2021) ("Although he suffers from medical conditions making him more vulnerable to serious illness or death from COVID-19, the risks posed to [Defendant's] health are minimal. His vaccination status provides sufficient protection against the risks."); *United States v. Rhodes*, 2021 WL 4460031, at *6 (W.D. Pa. Sept. 29, 2021) ("Because Rhodes received the two doses of the Moderna vaccine, the court cannot find that he met his burden to establish that he is at "uniquely high risk" of being infected or reinfected with the COVID-19 virus or experiencing serious illness if he is infected or reinfected with the COVID-19 virus.") (internal citation omitted); *United States v. Reed*, 2021 WL 2681498, at *4 (E.D. Pa. June 30, 2021) ("Now that COVID-19 vaccinations are being administered throughout the Bureau of Prisons, compassionate release motions generally lack merit."); *United States v. Singh*, 2021 WL 928740 (M.D. Pa. Mar. 11, 2021) (concluding that the prisoner's vaccination mitigated the risk of COVID-19, despite prisoner's underlying medical conditions of type 2 diabetes, obesity, hypertension, and hyperlipidemia, and no longer presented extraordinary and compelling reason for compassionate release).

---

variant, new research released Friday by the Centers for Disease Control and Prevention finds."); Jacqueline Howard, *Moderna booster shot increases antibody levels against Omicron, company says*, CNN (update Dec. 20, 2021 11:20 AM), https://www.cnn.com/2021/12/20/health/moderna-booster-omicron-bn/index.html ("Covid-19 booster shots can help improve protection against the Omicron coronavirus variant, and there is no need for a variant-specific booster dose at this time, Dr. Anthony Fauci, director of the National Institute of Allergy and Infectious Diseases, said last week.").

Mr. Hannigan only cites two cases in support of his release that post-date this Court's April 2021 Memorandum and both are distinguishable here. In *United States v. Moe*, the decision refers to this Court's "fact-specific approach to risk post-vaccination" from our April 2021 Memorandum. 2021 WL 5277202, at *5 (D.N.J. Nov. 12, 2021). That defendant was 70 years old, suffered from chronic medical conditions including chronic obstructive pulmonary disease (COPD), in addition to numerous conditions that developed post-sentencing, and was imprisoned at a BOP facility with the fourth highest COVID-19 infection rate in the country. *United States v. Moe*, 2021 WL 5277202, at *5-6 (D.N.J. Nov. 12, 2021). While Mr. Hannigan has some similar medical conditions, he is far younger, did not develop any similar post-sentencing conditions, and is imprisoned at a facility with minimal COVID-19 cases. In addition, the defendant was convicted of wire fraud and conspiracy to commit wire fraud for submitting false time sheets due to a foolish misunderstanding with his employer. *United States v. Moe*, 2021 WL 5277202, at *1 (D.N.J. Nov. 12, 2021). Here, Mr. Hannigan committed a far more serious crime affecting many victims over many years. It is worth noting that in all his filings seeking compassionate release, Mr. Hannigan makes practically no statement regarding any ownership of the lives he significantly disrupted or the addictions he did not address that contributed to his poor health and created chaos for his family.

Mr. Hannigan also cites a case under the Ninth Circuit, which this Court may look to as persuasive but need not follow. In that case, the court found defendant's "obesity and hypertension, coupled with the risk that he may be exposed to the Delta variant, constitute 'extraordinary and compelling' circumstances justifying a reduction in his sentence." *United States v. Pulido*, 2021 WL 4749794, at *5 (C.D. Cal. Oct. 12, 2021). However, at that time the efficacy of vaccination against variants was unclear and that defendant had not received a

booster shot. *United States v. Pulido*, 2021 WL 4749794, at *4 (C.D. Cal. Oct. 12, 2021). This Court referred above to multiple sources addressing the efficacy of vaccination and the booster shot against COVID-19 variants, all of which were published months after *Pulido*, and finds the current risk to Mr. Hannigan of severe illness from COVID-19 does not rise to the level of extraordinary and compelling reason to warrant compassionate release.

The Court previously addressed Mr. Hannigan's toe amputation and sleep apnea concerns and concluded that it did not present an extraordinary and compelling reason for release. ECF No. 56 at 15. Defendant's partial toe amputation occurred on January 27, 2021, prior to his previous Motion for Reconsideration. ECF No. 66 at 5. In addition, Mr. Hannigan's medical records less than one week prior to his partial toe amputation note that he is in non-compliance with his insulin doses by failing to show up 8 out of 21 times for his morning dose and 5 out of 20 times for his evening dose in the month of January. ECF No. 68 at 73. Records indicate that non-compliance was a common occurrence in December 2020 as well. ECF No. 68 at 73. This Court confirms its previous decision that "[a]bsent heightened risk, Mr. Hannigan's sleep apnea and risk of infection are not sufficiently extraordinary and compelling to warrant compassionate release." ECF No. 56 at 15.

Further, Mr. Hannigan's assertion that prisons in general are ill-equipped to prevent the spread of COVID-19 does not qualify as "extraordinary and compelling." *See e.g., United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The Third Circuit has made clear that "[t]he mere existence of COVID-19 in a society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release[.]" *Id.* This is certainly the case with USP Lewisburg, where the Government reports only three inmates tested positive for COVID-19 over the seven months prior to their Response and no inmates have died in the facility due to

COVID-19. ECF No. 66 at 4.  Regardless, this general concern is not sufficient to warrant compassionate release.[7]

### B.  § 3553(a) Factors

Though the Court does not find reason to grant compassionate release, which ends the discussion and denies Mr. Hannigan's Motion for Reconsideration, the Court additionally elects to consider whether a reduction in sentencing would be consistent with the relevant § 3553(a) sentencing factors. When determining whether a defendant is entitled to a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) a district court also looks to the relevant § 3553(a) factors including: "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; . . . and (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." ECF No. 33 at 9. No single factor is dispositive on its own, each are relevant to the compassionate release analysis. *See United States v. Rodriguez*, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020).

As this Court's April 22, 2021 Memorandum detailed the sufficiency of the medical care Mr. Hannigan received, the Court will only briefly confirm its decision here. Mr. Hannigan's

---

[7] Mr. Hannigan mentions in passing that this Court can grant release under the First Step Act without alleging why this Court should be compelled to do so. ECF No. 59.  As the Defendant presents no analysis on this policy, and certainly no new analysis, the Court again sees no reason to alter its lengthy evaluation of the First Step Act's impact on Mr. Hannigan's request for Compassionate Release in its July 2020 and April 2021 decisions. ECF No. 33 at 8-9; ECF No. 56 at 14-15.

extensive medical records show that the BOP is equipped to provide and has provided medical care for his diagnosed conditions. ECF No. 68. Mr. Hannigan is regularly evaluated and treated for his chronic conditions and has been tested on multiple occasions for COVID-19. ECF No. 68. Mr. Hannigan received his first dose of the Moderna COVID-19 vaccines on January 28, 2021 and his second dose on February 25, 2021. ECF No. 68 at 137. On December 8, 2021, Mr. Hannigan received a Moderna COVID-19 vaccine booster shot. ECF No. 73. Mr. Hannigan also received immunization against influenza on September 30, 2021. ECF No. 68 at 137. The Court previously noted that adequate attention was paid to Mr. Hannigan's toe infection pre- and post-surgery and finds no reason that has not continued to be the case over the past nine months or so. ECF No. 56 at 17.

Mr. Hannigan continues to assert that he has been denied adequate medical care because he never received a CPAP machine to treat his sleep apnea. While the defendant does present a link between sleep apnea and unrelated medical concerns, he has failed to show any link between sleep apnea and COVID-19. ECF No. 76 at 2-3. As the Court previously noted, we are unaware of any identified link between sleep apnea and increased risk from COVID-19. ECF No. 56 at 18. Mr. Hannigan has not shown that the lack of a CPAP machine puts him at a uniquely increased risk of COVID-19 or that such an infection could not be adequately treated in BOP custody. Ultimately, this Court has not been presented with any new evidence to alter its prior conclusion that Mr. Hannigan is being provided with needed medical care in an effective manner in line with the § 3553(a)(2)(D) sentencing factor.

Furthermore, Mr. Hannigan's alleged new conditions and "less th[a]n adequate" treatment are unsubstantiated and overshadow the progress Mr. Hannigan has made in improving his mental health as well as his "compromised immune system – caused by alcohol." See ECF

36

No. 59 & 29. Mr. Hannigan has reported positive progress regarding his mental health, as well as, shown newfound vigor to fight his alcoholism which he previously lacked. ECF No. 76. Mr. Hannigan has completed fifteen rehabilitation programs including RDAP. ECF No. 59. Furthermore, Mr. Hannigan reports that he attends AA meeting's daily. ECF No. 59. Through these programs Mr. Hannigan has developed healthy habits and strategies for improving his relationships. As Mr. Hannigan explained

> My independent study revealed, not surprisingly, that our addiction often causes us to neglect our relationships. The neglect contributes to a souring of the relationship, which in-turn causes the addict to seek alcohol more often as an escape, thus poisoning the relationship further. Consequently, I believe my problems with alcohol created a repeating cycle of destructive behavior for all of my relationships, especially those I claimed to hold so dearly. I believe RDAP came for me at just the right time in my recovery. I've developed an appreciation for each of the 8 attitudes that I will use regularly in my life. Also RDAP has taught me the skills needed to be an effective communicator, key to this skills is being an active listener. Lastly, rebuilding relationships with healthy foundations, which for me means the addition of openness and positive praise, areas that I have previously neglected. Regular practice of these three vital areas will greatly assist me in me reestablishing relationships with my wife, children and immediate family.

ECF. No. 76 attach. 2. Currently, Mr. Hannigan is alcohol free for the longest time since he was fourteen years old which has benefited his mental and physical well-being. PSR ¶ 79 and ECF 76 attach. 2.

Prior to his conviction Mr. Hannigan was suicidal and had suffered an alcohol induced seizure. Since then, Mr. Hannigan has committed to abstinence from alcohol and is actively improving his mental health. Mr. Hannigan has even chaired AA meetings where he shares his own struggles with addiction and tries to help others who are also struggling with addiction. ECF No. 18. Ms. Hannigan stated that she has seen a "deep shift" in Mr. Hannigan's approach to his addiction and life. *Id*. Ms. Hannigan said, "I've never seen him do this kind of work before…He is becoming the person that he was twenty years ago – getting up everyday trying to be better."

*Id*. It is clear, Mr. Hannigan is not only being provided the proper medical care in line with the §
3553(a)(2)(D) sentencing factor but he is receiving invaluable educational and correctional
treatment as prescribed in the § 3553(a)(2)(D) sentencing factor.

Mr. Hannigan's abstinence from alcohol has unmistakably helped improve his overall
health and a sustained abstinence needs to be Mr. Hannigan's prime goal upon release into the
community. Evidently, forced confinement has been compassionate in that Mr. Hannigan is
getting sustained medical care and has had no choice but to quit drinking which has immensely
improved his overall health and perspective. Unfortunately, in July of 2019, while in home
confinement and having the capacity to choose for himself, Mr. Hannigan relapsed and began
drinking again when faced with the realities of this criminal case and fear of public reprimand in
his community. ECF No. 18. Following his relapse, Mr. Hannigan was readmitted to Clearbrook
Treatment Center on July 31, 2019. Since that date Mr. Hannigan's prison regimen has afforded
him the opportunity of a strict routine that has consequently compelled him to remain sober and
refocus his efforts on committing to sobriety. Mr. Hannigan will need to spend the time in the
halfway house he is scheduled to be released to in May of 2022, before returning to his home in
October of 2022, in order to reach a sustainable sober lifestyle when given the capacity to either
return to alcohol abuse or not.

It is in the best interest of Mr. Hannigan, his own health, the health, safety and welfare of
his family, and of his community for him to remain sober and committed to his pledge of
abstinence. To that end, Mr. Hannigan needs to spend these last, few months in prison preparing
for his release to a halfway house, accepting the punishment (which was minor in the context of
he was not charged with all of the individual thefts, identity thefts and forgeries) and completing
his full term to give his victims some sense that there is "justice" in the justice system and to

give his family a chance to prepare itself as he segues to a stable setting without the concern that Mr. Hannigan — when faced with the stresses and realities of life not managed by strict, compulsory routines — will again turn to alcohol and again destabilize his family.

In short, Mr. Hannigan needs to be able to say, I did the crime, and I did the time while he also thinks about the ways in which he will go about making restitution.  The court has compassion, but on the compassion scale at this time, the compassion weighs heavily in favor of his victims including his immediate family.

As for the remaining § 3553(a) factors, Mr. Hannigan should be required to continue his sentence. There is ample support in the record noting the prolonged, intentional nature of Mr. Hannigan's crimes and the ongoing negative impact it has had on his victims. Considering all relevant facts, the Court maintains that granting compassionate release would not appropriately reflect the nature and circumstances of Mr. Hannigan's crimes, promote just punishment, or afford adequate deterrence to future criminal conduct. *See* 18 U.S.C. § 3553(a).

Furthermore, Mr. Hannigan has not presented either an intervening change in controlling law or newly available evidence, nor has he suggested some need to correct a clear error or prevent manifest injustice, which might compel the Court to reconsider its prior analysis of the § 3553(a) sentencing factors. Mr. Hannigan's second Motion for Reconsideration lacks any evidence of new case law that would satisfy the first factor in § 3553(a). The two cases he cited that were filed after this Court's April 2021 decision were both distinguished above and neither represent a precedential reinterpretation nor change to the controlling law. Further, aside from the emergence of the omicron variant, all of the conditions described in Mr. Hannigan's second Motion for Reconsideration existed at the time of this Court's April 2021 Memorandum and cannot be considered newly available evidence. Nor does this Court's prior determination that

Mr. Hannigan received adequate medical care from his frequent medical consultations without evaluating in detail if it was the most effective care (§ 3553(a)(2)(D)) represent a clear error or manifest injustice.

Therefore, Mr. Hannigan has not proven that this Court should reconsider its decision to deny compassionate release.

## V.   CONCLUSION

For the foregoing reasons, Defendant Myles Hannigan's Motion for Reconsideration is **DENIED**. A corresponding Order will follow.

**BY THE COURT:**

**DATED**: 3/17/2022                             /s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**

Cc:   U.S. Attorney
      Probation Office
      *Pro Se* Movant